```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MISSOURI
                       EASTERN DIVISION

ARCHIE E. HORTON,                )
                                 )
            Plaintiff,           )
                                 )
       v.                        )     No. 4:05 CV 65 DDN
                                 )
HUSSMANN CORPORATION and         )
ASET CORPORATION,                )
                                 )
            Defendants.          )
```

**MEMORANDUM**

This action is before the court on the motions of defendants Hussmann Corporation (Doc. 66) and ASET Corporation (Doc. 63) for summary judgment. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636©. (Doc. 23.) A hearing was held on October 17, 2007.

**I.  BACKGROUND**

This case arises out of an undercover investigation by ASET Corporation (ASET) into employee misconduct at Hussmann Corporation's (Hussmann) Bridgeton, Missouri facility. Plaintiff Archie E. Horton brought this action for racial discrimination against defendants Hussmann and ASET, under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., and 42 U.S.C. § 1981. (Doc. 40.) In Count I of his amended complaint, Horton claims Hussmann violated Title VII by targeting him for investigation because of his race and firing him because of his race. In Count II, he claims Hussmann violated § 1981 by firing him based on his race. In Count III, Horton claims ASET violated § 1981 by participating in the race-based investigation and his racially-motivated discharge. ( Id.)

In its answer, Hussmann denies that it discriminated against Horton in violation of Title VII and § 1981. Instead, Hussmann argues the decision to fire Horton was based on legitimate, nondiscriminatory reasons, and race played no role in the decision. (Doc. 42.) In its answer, ASET also denies it participated in discriminating against Horton in violation of § 1981. Instead, ASET argues its decisions

concerning Horton were based on legitimate, nondiscriminatory reasons, and race was not a factor.  (Doc. 50.)

On September 27, 2007, the court issued an order, ruling the parties' motions to strike portions of the record.  (Doc. 92); <u>Horton v. Hussmann Corp.</u>, No. 4:05 CV 65 DDN, 2007 WL 2885166 (E.D. Mo. Sept. 27, 2007).

## II.  STATEMENT OF UNDISPUTED FACTS

Archie Horton brought this action on the belief that he was fired from Hussmann because of his race.  (Doc. 67, Ex. A at 3.)  Horton works at Hussmann's Bridgeton facility, where the company manufactures commercial refrigeration equipment.  The company employs close to 1,500 employees; about half of the employees are African-American.  (Doc. 80 at 11.)

Hussmann hired Horton on August 3, 1993.  (Doc. 67, Ex. C at 1.)  In August 2002, Hussmann hired ASET to conduct an on-site investigation into employee misconduct at the Bridgeton facility.  (Doc. 64, Ex. A at 1; Doc. 67, Ex. D at 1.)  In a letter to Richard Kurt, the Human Resources Manager at Hussmann, Charles Carroll explained the nature of ASET's investigation.  "The purpose of this investigation shall be to observe and document theft of company or personal property, illegal drug use or dealing, unsafe work practices, violations of company policies and procedures, as well as other improper or unethical activities that may become apparent."  (Doc. 67, Ex. D at 1.)  As part of the investigation, one or more undercover agents would pose as a Hussmann employee.  The letter added that ASET would provide written and verbal reports to Hussmann representatives.  (<u>Id.</u>)  Charles Carroll is the President and CEO of ASET.  (Doc. 64, Ex. A at 1.)

Jocelyn Taylor was the undercover agent assigned to the Hussmann investigation.  Olen F. Martin, a former police officer, was also assigned to the Hussmann investigation, but he operated primarily from ASET headquarters.  Martin acted as a supervisor of the investigation, and reported to Carroll.  Taylor reported to both Martin and Carroll.  Taylor was at the Hussmann facility from October 4, 2002 until June 26,

2003.  (Doc. 77, Ex. 3 at 2.)  As part of her investigation, Taylor prepared various reports for Hussmann.  (Id. at 3.)

Only ASET conducted the investigation.  (Doc. 80 at 14.)  No one with ASET ever subjected Horton to any racially offensive speech.  In addition, no one with ASET ever personally told Horton that African-Americans were the target of the investigation.  (Doc. 67, Ex. A at 6-8).[1]  Nothing Taylor said to Horton indicated she was specifically targeting African-Americans for investigation.  (Id. at 8.)

During the course of her investigation, Taylor kept a log of her daily activities.  (See Doc. 67, Ex. E.)  On October 23, 2002, for instance, Taylor reported doing audits on line 15, and making three new contacts: Cozen Harris, an African-American male, Mark Moore, a white male, and Rick, another white male.  (Doc. 67, Ex. E at 18, 21.)  On October 31, 2002, Taylor reported doing audits on line 16A, and making contacts with two men named Mike, both white, Scott, a white male, and Ed, an African-American male.  (Id. at 17.)  On November 12, 2002, she reported doing audits on lines 2A, 4A, 8A, and 15A, and making contact with Joe Zerkle, a white male.  (Id. at 13.)  On November 19, 2002, Taylor reported having a conversation with Scott, a white male, about his attendance problems.  (Id. at 11, 17.)  On November 25, she reported having a drug-related conversation with an African-American male, though he might have been biracial.  Taylor did not catch his name.  She also noted making contact with Paul and Kevin, both white males.  She did audits on lines 4A and 15A that day.  (Id. at 7.)

Taylor's log reports continued into December and January.  On December 10, 2002, Taylor noted having another drug-related conversation, in which she asked Tom, a white male, where she might get some marijuana.  According to Taylor, Tom responded that Steve, a white male, might be able to help her.  Taylor also noted making contact with Archie Horton for the first time.  (Id. at 5-6, 18.)  On December 11,

---

[1] Horton, however, believes that the investigation only targeted African-American employees.  (Doc. 40 at 1.)  Meanwhile, Hussmann asserts that Taylor contacted a great number of white employees - as noted by Taylor's daily reports back to ASET.  (Doc. 67 at 4.)

-3-

Taylor reported having a drug-related conversation with Keith.[2] She also noted making contact with Beverly, a white female, and doing audits on lines 2A, 4A, and 16A. (Id. at 3.) January 17, 2003 is the last day of Taylor's daily log reports. She reported doing audits on lines 3A, 15A, and 16A, and making contact with Jaime, a white female. (Id. at 1.)

Archie Horton and Keith Harris each worked on line 16. Between eight and ten Hussmann employees worked on line 16. Of those employees, four were African-American, including one who was a supervisor. (Doc. 80, Ex. 2 at 9.) In his deposition, Horton stated that Taylor spent a lot of time on line 16, and in his opinion, only hung around African-Americans. (Doc. 67, Ex. A at 25.) He believed she paid particular attention to Harris during the breaks. Horton said he never saw Taylor speaking to any white employees at Hussmann, or any white employees speaking to Taylor. (Doc. 80, Ex. 2 at 5, 9.)

On June 5, 2003, and July 2, 2003, ASET prepared an Executive Summary Report. The reports provided summaries of Agent Taylor's investigative activities. The facts within the summaries are derived from daily activity reports, incident reports, financial reports, client recommendations, and police recommendations. (Doc. 67, Exs. F, G.) In the June 5 summary, ASET provided a break-down of possible company violations. (Doc. 67, Ex. F at 3.) According to the report, five employees had possible drug-related violations: Keith Harris, Archie Horton, Antwon "Tony," Alex, and "Short Dog." Five employees had possible non-drug related violations: Keith Harris, Ed Johnson, Myron Jones, Mark, and Darren D. (Id.) Among the listed individuals, Keith Harris, Archie Horton, and Antwon "Tony" are noted to be employees who possibly committed criminal violations. The summary report does not list anyone's race. (See id.)

According to the June 5, 2003 report, Horton's alleged drug-related violation occurred on March 13, 2003. On that day, Taylor reported having a general conversation with Keith Harris and Archie Horton.

---

[2] Keith's race is not indicated in the log report. (Doc. 67, Ex. E at 3.)

During the conversation, the report notes, "Keith gave Archie a bag of suspected Marijuana." (Id. at 10.)

Horton has smoked marijuana in the past. In his deposition, he noted that in the three months before being fired, he had smoked at least two joints. (Doc. 67, Ex. A at 31.) Horton also admitted to smoking a joint the day before the interview on July 22, 2003. (Id. at 37.) Horton reported buying his marijuana from someone who did not work at Hussmann. A friend had referred him to this dealer some ten years ago. (Id. at 32.)

Horton never saw any whites smoking marijuana at work, and never personally heard any discussion among white employees regarding drug use. (Doc. 67, Ex. A at 33-34.) As hearsay, Horton had heard from Keith Harris that Tammy Manzella, a white woman, would sell marijuana on the job. In fact, Harris stated he was buying marijuana from Manzella. (Doc. 67, Ex. A at 87-89.)

On July 22, 2003, Olen Martin, the ASET supervisor, interviewed Horton. (Doc. 67, Ex. H.) Keith Kniepkamp, the Human Resources Manager, was present during the interview. (Doc. 67, Ex. H at 17.) During the interview, Martin told Horton that he had been seen possessing illegal drugs on company property on March 13, 2003. (Id. at 13-15; Doc. 67, Ex. A at 23.) At the end of the interview, Kniepkamp told Horton that he was being suspended while Hussmann completed an investigation of the incident. (Doc. 67, Ex. H at 17-18; Doc. 67, Ex. A at 9.) The next day, Horton reported to the Hussmann facility for a second meeting. At this meeting, Kniepkamp informed Horton that he was being fired. (Doc. 67, Ex. A at 9-12.) Kniepkamp acted professionally and did not make any offensive remarks when he told Horton of his termination. (Id. at 15.) ASET did not fire Horton. (Doc. 77 at 5.)

Martin interviewed five other Hussmann employees in "shut-down interviews," all of whom were African-American. Besides Horton, Martin also interviewed Keith Harris, with respect to a number of legal and company violations. Ed Johnson and Mark Knox were interviewed for suspected sexual harassment, Chris "Shortdog" Perry was interviewed for suspected marijuana use, and Darren Garner was interviewed for suspected alcohol use on company premises. (Doc. 77, Ex. 3 at 3-5.)

-5-

After being fired, Horton was out of work for about three months. (Doc. 67, Ex. A at 16.) During this time, he did not prepare a résumé, attend any job fairs, or search for jobs on-line, though he did search the St. Louis Post-Dispatch job advertisements and apply for unemployment benefits. Horton received unemployment benefits in the amount of $250 a week while unemployed. Horton's pay at Hussmann was around $425 per week. (Id. at 17-20.) Hussmann rehired Horton on October 27, 2003. (Doc. 80, Ex. 1 at 1; Doc. 77, Ex. 5 at 11.) Horton was therefore out of work from July 22, 2003 until October 27, 2003. (Doc. 77, Ex. 5 at 11.)

During his employment with Hussmann, Horton was never subjected to any racially derogatory or offensive speech by a supervisor. (Doc. 67, Ex. A at 27-28.) The collective bargaining agreement between Hussmann and the union stated that Hussmann would not discriminate for, or against, any employee on account of race, creed, or color. (Doc. 67, Ex. B at 29.) The collective bargaining agreement also provided that "[a]ny employee . . . in possession of illicit drugs during working hours or while on company property will be subject to discharge." (Id. at 45.)

On January 18, 2005, Horton filed this lawsuit. (Doc. 2.)

### III. SUMMARY JUDGMENT

Summary judgment must be granted when the pleadings and proffer of evidence demonstrate that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56©; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Devin v. Schwan's Home Serv., Inc., 491 F.3d 778, 785 (8th Cir. 2007). The court must view the evidence in the light most favorable to the nonmoving party and accord it the benefit of all reasonable inferences. Devin, 491 F.3d at 785. A fact is "material," if it could affect the ultimate disposition of the case, and a factual dispute is "genuine," if there is substantial evidence to support a reasonable jury verdict in favor of the non-moving party. Die-Cutting Diversified, Inc. v. United Nat'l Ins. Co., 353 F. Supp. 2d 1053, 1054-55 (E.D. Mo. 2004).

Initially, the moving party must demonstrate the absence of an issue for trial. <u>Celotex</u>, 477 U.S. at 323. Once a motion is properly made and supported, the nonmoving party may not rest upon the allegations in its pleadings but must instead proffer admissible evidence that demonstrates a genuine issue of material fact. Fed. R. Civ. P. 56(e); <u>Howard v. Columbia Pub. Sch. Dist.</u>, 363 F.3d 797, 800 (8th Cir. 2004); <u>Krein v. DBA Corp.</u>, 327 F.3d 723, 726 (8th Cir. 2003).

## IV. DISCUSSION

In its motion for summary judgment, Hussmann argues that there is no genuine issue of material fact and Horton cannot establish a prima facie case of racial discrimination. In particular, Hussmann maintains that Horton cannot establish that any similarly situated employee was treated differently. Even assuming he could establish a prima facie case, Hussmann claims Horton could not establish that the legitimate, nondiscriminatory reasons for firing Horton served only as a pretext. Finally, Hussmann argues that Horton failed to mitigate his damages and should not receive back pay if the case survives summary judgment. (Docs. 67, 85.)

In response to Hussmann's motion, Horton argues that he has established a prima facie case of discrimination. In particular, he argues Hussmann has overstated the plaintiff's burden under the <u>McDonnell Douglas</u> scheme. According to Horton, a plaintiff's burden at the prima facie stage is minimal, and in a wrongful termination case the plaintiff does not need to show similarly situated employees were treated differently. That said, Horton maintains that he has proved Hussmann treated him differently than white employees. He also argues that the company has failed to articulate a legitimate, nondiscriminatory reason for its conduct through admissible evidence. Finally, Horton claims Hussmann has not proved he should not receive back pay. (Doc. 80.)

In its motion for summary judgment, ASET argues that Horton cannot prove a prima facie case of racial discrimination. In particular, ASET maintains that it did not employ Horton and therefore did not discharge him or participate in the decision to discharge him. ASET also argues

it had no knowledge of Hussmann's disciplinary procedures, did not make any recommendations to Hussmann, and had no knowledge of what the company's response might be. Finally, ASET argues that Horton's discharge was rescinded. (Doc. 64, 86.)

In response to ASET's motion, Horton argues that ASET impaired his employment relationship with Hussmann, in violation of § 1981. More precisely, Horton argues there is sufficient evidence to allow a jury to conclude ASET played a role in his discharge. According to Horton, ASET was aware of the relationship between Horton and Hussmann, and a jury could conclude that ASET knew its conduct could jeopardize Horton's employment. Finally, Horton argues that his reinstatement is irrelevant. (Doc. 77.)

### A. Discrimination under Title VII

Title VII of the Civil Rights Act makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff complaining of discrimination may survive a motion for summary judgment in two ways. Arraleh v. County of Ramsey, 461 F.3d 967, 974 (8th Cir. 2006), cert. denied, 127 S. Ct. 2100 (2007). First, the plaintiff may present direct evidence of discrimination. Id. Direct evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision. Id. This link must be sufficient to allow a reasonable fact finder to conclude that an illegitimate reason actually motivated the adverse employment action. Id. If direct evidence is unavailable, the plaintiff may avoid summary judgment by creating an inference of unlawful discrimination under the Supreme Court's McDonnell Douglas analysis. Id. at 975 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973)).

The McDonnell Douglas analysis consists of a three-prong, burden-shifting analysis. Carpenter v. Con-Way Cent. Express, Inc., 481 F.3d 611, 616 (8th Cir. 2007). In the first prong, the plaintiff must establish a prima facie case of discrimination. St. Mary's Honor Ctr.

v. Hicks, 509 U.S. 502, 506 (1993). To establish a prima facie case of discrimination under Title VII, a plaintiff must show: (1) he is a member of a protected class; (2) he met his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated differently. Carpenter, 481 F.3d at 616. A plaintiff is similarly situated to employees outside the protected class if the other employees were involved in, or accused of, the same or similar conduct, but were disciplined in different ways. Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 852 (8th Cir. 2005).[3]

Once a plaintiff has established a prima facie case of discrimination, the employer may rebut the plaintiff's case by articulating a legitimate, nondiscriminatory reason for its decision. Arraleh, 461 F.3d at 975. If the employer presents a nondiscriminatory reason for its decision, the plaintiff has the opportunity to demonstrate that the employer's offered reason is not the real reason for the employment decision, but merely a pretext for discrimination. Id. at 975-76. Despite the burden shifting in McDonnell Douglas, the ultimate burden of proving intentional discrimination remains at all times with the plaintiff. St. Mary's Honor Ctr., 509 U.S. at 507.

As an initial matter, Horton argues the defendants have overstated the plaintiff's burden in establishing a prima facie case. Instead of having to prove similarly situated employees were treated differently, Horton argues the fourth prong of the prima facie test requires him to show "there really was a job opportunity at stake." (Doc. 80 at 3.) Horton adds that a number of courts have criticized, and abandoned where appropriate, the similarly situated prong. In support of this position, Horton cites Williams v. Ford Motor Co., 14 F.3d 1305 (8th Cir. 1994), a number of times. Under Williams, a Title VII plaintiff does not have to show he was replaced by someone outside his protected class. Id. at 1307-08. Williams does not, however, establish a different test for a

---

[3] In Rodgers, the court noted a conflict within the Eighth Circuit regarding the "similarly situated" standard. Rodgers, 417 F.3d at 851. At the prima facie stage, other panels have used a somewhat stricter standard, asking whether the plaintiff was similarly situated in all relevant respects to the employees outside the plaintiff's class. Id.

-9-

prima facie case. See id. at 1308. The court specifically stated that a Title VII plaintiff must show that his "discharge occurred under circumstances which create an inference of discrimination." Id. The panel went on to note that Williams had established a prima facie case because "other similarly situated employees outside his protected group were treated differently." Id. at 1308-09. The court discussed the definition of "similarly situated." Id. at 1309. The law within the Eighth Circuit is clear: as part of his prima facie case, a Title VII plaintiff must show that similarly situated employees outside the protected class were treated differently. See e.g. Devin v. Schwan's Home Serv., Inc., 491 F.3d 778, 788-89 (8th Cir. 2007); Thomas v. Corwin, 483 F.3d 516, 529-30 (8th Cir. 2007); Carpenter, 481 F.3d at 616; Twymon v. Wells Fargo & Co., 462 F.3d 925, 934 (8th Cir. 2006).

Horton also argues that recent decisions of the Eighth Circuit have not required a plaintiff to establish a prima facie case. (Doc. 80 at 6) (citing Gordon v. Shafer Contracting Co., 469 F.3d 1191, 1196 (8th Cir. 2006), Fjelsta v. Zogg Dermatology, PLC, 488 F.3d 804, 810 (8th Cir. 2007)). In Gordon, the Eighth Circuit assumed, for the sake of argument, the plaintiff had established a prima facie case because summary judgment was proper under a pretext analysis. Gordon, 469 F.3d at 1196. In Fjelsta, the court agreed "with the district court that Fjelsta did not satisfy her prima facie case . . . ." Fjelsta, 488 F.3d at 810. These cases do not establish any rule for assuming a prima facie case.

Turning to his prima facie case, Horton has failed to offer legally sufficient evidence that similarly situated white employees were treated differently. Horton could show that similarly situated whites were treated differently by proving Hussmann never disciplined white employees suspected of misconduct or white employees were simply never targeted for investigation. In this case, Horton has not pointed to any white employee, suspected of illegal activities, who went undisciplined. In fact, he admits that he never heard any white employees discussing drug-related activities. Through inadmissible hearsay, he attempts to associate Tammy Manzella, a white female, with illegal drug activities. Not only is the reference to Manzella inadmissible, but Horton does not

-10-

allege that either ASET or Hussmann suspected Manzella of the purported misconduct or were ever informed of Manzella's alleged improprieties. See Cronquist v. City of Minneapolis, 237 F.3d 920, 927 (8th Cir. 2001) (Title VII plaintiff cannot rely on hearsay to defeat a motion for summary judgment); see also Twymon, 462 F.3d at 930 n.3 (court cannot rely on inadmissible hearsay in deciding summary judgment motion).

Horton's main theory of discrimination rests with his assertion that Taylor only investigated African-American employees and spent most of her time around the plaintiff on line 16. Hussmann disputes this assertion by pointing to Taylor's daily activity log. In her daily activity log, Taylor reports making contact with several different Hussmann employees, a number of whom are white. In fact, on December 10, 2002, Taylor engaged Tom, a white male, in a drug-related conversation. In addition, the notes from the daily log show Taylor spent her time conducting audits on a variety of different lines. On a motion for summary judgment, Horton may not simply rest upon his allegations; he must proffer admissible evidence that demonstrates a genuine issue of material fact. Fed. R. Civ. P. 56(e); Howard, 363 F.3d at 800. Under the circumstances, Horton has failed to offer admissible evidence that would create a material issue of fact with regard to Taylor's activities.

Finally, Horton notes that Hussmann only disciplined African-American employees. This alone is not enough to establish a prima facie case under Title VII. "[T]here is an important difference between evidence of a disparate impact and evidence sufficient to support an inference of intentional discrimination." Murray v. Se. Pa. Transit Auth., No. Civ. A. 96-7971, 1998 WL 98987, at *8 (E.D. Pa. Mar. 9, 1998); see also N.Y. City Transit Auth. v. Beazer, 440 U.S. 568, 584-87 (1979) (urging caution when statistics are being used to prove discrimination). In Murray, the Transit Authority conducted an investigation into employee misconduct. Murray, 1998 WL 98987, at *1. After being fired, Harold Murray claimed racial discrimination because statistics revealed the investigation targeted a disproportionate number of African-Americans. Id. at *4. Despite a sample-size in the thousands, the court found statistics alone were insufficient to

establish disparate treatment.  Id. at *5, 8.  In this case, only six individuals out of close to 1,500 employees were ultimately interviewed for wrongdoing.  This is simply too small a sample-size from which to infer Hussmann illegally discriminated against African-American employees.  See Jones v. Provena St. Joseph Med. Ctr., No. 98 C 5058, 2000 WL 378528, at *7 (N.D. Ill. Jan. 7, 2000) (dealing with a sample size of fifteen employees), aff'd, 234 F.3d 1273 (7th Cir. 2000). "Where the sample group of compared employees is very small, the possibility that the disparity is merely due to chance rises significantly."  Id.  Disparities taken from small samples are inadequate to support an inference of discrimination.  Id.  Horton's statistical argument is therefore unavailing.

Where a party has failed to make a sufficient showing on an essential element of his case, other facts become immaterial, and further analysis becomes unnecessary.  Celotex, 477 U.S. at 322-23. Horton has failed to offer any legally sufficient evidence that Hussmann treated similarly situated white employees differently.  It is therefore unnecessary to consider whether Hussmann proffered a legitimate, nondiscriminatory reason for Horton's discharge.[4]  Unable to establish an essential element of his prima facie case, summary judgment is proper on Horton's Title VII discrimination claim.

### B. Discrimination under § 1981

Section 1981 provides that all persons within the United States shall have, among other rights, the same right to make and enforce contracts regardless of race.  42 U.S.C. § 1981; Domino's Pizza v. McDonald, 546 U.S. 470, 475 (2006).  The purpose of § 1981 is to prohibit discrimination in the performance, modification, and termination of contracts, as well as to protect the enjoyment of the

---

[4]T  Horton argues Hussmann has not provided any admissible evidence of the legitimate, nondiscriminatory reason for firing Horton. (Doc. 96 at 1.)  Yet, in his EEOC charge, Horton stated, "[o]n July 22, 2003, I was informed that I was being terminated for possession of non-prescribed drugs on company premises."  (Doc. 67, Ex. C.)  This statement is admissible as an admission by a party-opponent. Fed. R. Evid. 801(d)(2).

benefits, privileges, terms, and conditions associated with the contractual relationship. Williams v. Lindenwood Univ., 288 F.3d 349, 355 (8th Cir. 2002). Like Title VII, claims under § 1981 are governed by the McDonnell Douglas burden-shifting analysis. Id.

To establish a prima facie case of racial discrimination under § 1981, a plaintiff must show: (1) he is a member of a racial minority; (2) the defendant intended to discriminate against him on the basis of race; and (3) the discrimination concerned an area protected by the statute. Id. Once the plaintiff establishes a prima facie case of racial discrimination, the burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for its actions to rebut the presumption of discrimination. Id. If the defendant establishes a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to demonstrate the defendant's reason is a mere pretext for unlawful discrimination. Id. Ultimately, the court must determine whether the evidence is sufficient to create a genuine issue of material fact as to whether the defendant intentionally discriminated against the plaintiff. Id.

In his complaint, Horton claims Hussmann violated § 1981 by firing him based on his race and ASET violated § 1981 by conducting a race-based investigation and participating in his racially-motivated discharge. Since Horton has not offered legally sufficient evidence that either Hussmann or ASET intended to discriminate against him on account of his race, each of these claims fails. During his employment with Hussmann, Horton was never subjected to any racially derogatory speech by a supervisor. During the interview on July 22, 2003, Kniepkamp acted professionally and did not make any offensive remarks. Likewise, no one with ASET ever subjected Horton to any racially offensive speech, and no one with ASET ever personally told Horton that African-Americans were the target of the investigation. See id. (the repeated use of racial terms with references to criminality and accusations that the presence of African-Americans created a climate of fear raised an inference of discriminatory intent); see also Browning v. President Riverboat Casino-Mo., Inc., 139 F.3d 631, 635 (8th Cir. 1998) (evidence of conduct or statements by supervisor or decision-maker

reflecting a discriminatory attitude can be sufficient to show race was a motivating factor in an employment decision). Beyond his bare allegations, Horton has not offered any proof the defendants intended to discriminate against him. See Fed. R. Civ. P. 56(e); Howard, 363 F.3d at 800.

ASET also argues it did not contract with Horton and therefore did not impair Horton's rights under § 1981. A section 1981 plaintiff must identify injuries flowing from a racially motivated breach of his own contractual relationship. Domino's Pizza, 546 U.S. at 480. The protections of § 1981 extend only to situations where "the plaintiff has or would have rights under the existing or proposed contractual relationship." Id. at 476. Under this test, a third-party intended beneficiary of a contract may have rights under § 1981. Id. at 476 n.5. It is less clear, however, whether a wronged plaintiff may proceed against a defendant not a party to the contract. See Felton v. Polles, 315 F.3d 470, 480 (5th Cir. 2002). "It is not clear whether a § 1981 claim lies against an individual defendant not a party to the contract giving rise to the claim." Id.; but see Flores v. City and County of Denver, 30 F. App'x 816, 819 (10th Cir. 2002) (finding privity of contract not required to sue an individual defendant under § 1981). Because Horton's claims against ASET fail for other reasons, the court declines to address whether extra-contractual defendants fall within the scope of § 1981.

Finally, it is worth noting Hussmann does not have to prove Horton actually purchased marijuana on company property before disciplining him. See Johnson v. AT & T Corp., 422 F.3d 756, 762 (8th Cir. 2005). An employer may legally fire an individual if it honestly believed the individual committed an infraction. Id. An employer's honest belief of wrongdoing, even if incorrect, and even if later disproved, does not indicate that unlawful discrimination motivated the employer's decision. Id. at 762-63; see also Smith v. Papp Clinic, P.A., 808 F.2d 1449, 1452-53 (11th Cir. 1987) ("[I]f the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not 'because of race' and the employer has not violated § 1981."). In this case, the

agent's investigation led to a written report, implicating Horton in a drug purchase on Hussmann property.  Under the circumstances, both ASET and Hussmann could honestly believe Horton had committed a crime and act accordingly.  Under the collective bargaining agreement, any Hussmann employee in possession of illicit drugs during working hours or while on company property is subject to discharge.  ( Doc. 67, Ex. B at 45.)

Horton has failed to offer legally sufficient evidence that either Hussmann or ASET intentionally discriminated against him on account of his race.  Unable to establish an essential element of his prima facie case, summary judgment is proper for both Hussmann and ASET on Horton's § 1981 discrimination claims.   See Celotex, 477 U.S. at 322-23.

## V.  CONCLUSION

For the reasons stated above, the motions of defendants Hussmann Corporation and ASET Corporation for summary judgment are granted.  An order in accordance with this memorandum is filed herewith.


/S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on November 9, 2007.